The third case scheduled for argument this morning is number 21-901, Alexandra Perciballi v. Ethicon. Good morning, Your Honors. May it please the Court. Scott Horne, counsel representing the appellants in this matter. It's our contention, Your Honors, that the District Court erred in awarding summary judgment to the defendants and dismissing the complaint as time barred. The accrual cutoff date in this context is April 15, 2010. Dr. Master Pietro, who is the only treating physician to have testified in this case, established that as of 2011, there was no symptom or indication that the TVT slings in question had malfunctioned. There was nothing wrong with it. That's correct. And that testimony is found at pages 175-176 in the record. And we submit that the testimony and these findings of Dr. Master Pietro are the single most critical piece of medical evidence in this case on this summary judgment motion. What about Dr. Elliott at Appendix 424, where he said that by 2006 or 2002, TVT had failed? That's your doctor, right? That's correct, Your Honors. You paid him for that opinion?  But I think that when you look at the totality of the situation, it's a very complex set of symptoms and conditions that were presented by the plaintiff. No, go ahead and finish your answer. I didn't mean to cut you off. The defendant's own expert, which they did not submit in front of somebody- Dr. Grimes. I'm sorry, Your Honor? Dr. Grimes. Correct, Your Honor. So an entire host of pre-existing conditions before even the first sling was put in place. He's talking about causation. He says at A404 to 411, he says that there are multiple possible causes, and in some cases that she may have had situations that pre-existed the devices. So he's really opining that whatever she's feeling, it wasn't caused by the devices, which curiously is helpful to you. Well, at that particular time, yes, that's exactly right. But when you fast forward, so Dr. Mastropietro's treatment encompasses both before the accrual cutoff date and after. She does the operation, she does the second TVT in 2006, right? Yes, she does, Your Honor. She has lousy recollection, but she has notes, so she testifies in the notes. That's right. That based upon a review of the records of your client, that had there been a failure of the 2002 TVT, she would have replaced it. And she clearly says that, and this is at A142 to 143, also at A167 and 170. She says that the TVTs show, quote, no abnormalities or any pain or tenderness in the region of the TVT, that her urinary retention test yielded normal results. So she's looking at objective tests. And that she had no complaints or problems attributed to the 2002 TVT. And I think that's critical, and that's a point that I think was lost in the papers that were submitted in the lower court. You seem to seize on your client's statement answer in the MDL questionnaire of that. Was she counseled when she filled that questionnaire out? You know, I can't answer that question. I wasn't involved in the case back then. I assume so, because it was- I think the questionnaire says that she was counseled, that she had a lawyer at the time. Yeah, I knew she was counseled. Okay. I don't ask a question if I don't know the answer. So, but in any event, she seemed to hold your client to that conclusion. Yet, your client can't testify to causality, can she? Well, that's the point. They kind of used my client, a layperson- She can tell how she feels, but she can't tell why she feels it. That's right. That's exactly right, Your Honor. I mean, in a nutshell, that is exactly right. New York law says that the clock starts to run with regard to the insertion of devices at the time of causation. That's correct. Not at the time of diagnosis. At the time of device malfunction. Malfunction, right. Causation of injury. Of the injury, that's correct, Your Honor. But in the cases that talk about that it doesn't start to run from diagnosis are cases in which the relationship between the symptom and the causation is not known until later. But here the question is, what does her statement mean in terms of that she was experiencing difficulties? I think at the end of the day, Your Honor, we're talking about, again, and I want to go back to this point that I started to make earlier, a complex set of symptoms. So when she fills out an extensive pelvic organ prolapse, intercourse pain, incontinence, pelvic floor weakness, these all started before the first TVT implant. So when she is asked to fill out a questionnaire, she's putting down all of her problems. Why is she saying following the implant I experienced these? Because the problem here, Your Honor, and it's not a problem, but conceptually. So if an implant is placed and it doesn't correct the symptom, that doesn't mean it's malfunctioning. And I'm sure even defense counsel would acknowledge that. There's going to be implantations that simply do not cure what the symptoms are underlying. That doesn't mean it's a malfunction. So you're saying that the phrase following the implant doesn't imply that she was not experiencing those before? I think it implies that personally. I think it implies that she experienced it throughout this entire time period, frankly. And, again, it's a layperson that's filling this out, and we have a wealth of medical evidence that creates that. Well, we know in 2002 she had the first insertion, and she was experiencing difficulties prior to 2002. That's why she got the implant. That's right. That's exactly right, Your Honor. But what about the right groin pain? The pelvic pain seemed to be exacerbated and changed after the first implant. Is that wrong? Well, I would disagree with the concept that abdominal pain or diffuse pelvic pain is the equivalent of vaginal pain, which is ultimately what happened when the TVT sling eroded to the point where it gave out because of the scarification and what they call fibro bridging as a consequence of the small pores in the mesh. Excuse me? Your argument is that's when it malfunctions? That's correct, Your Honor. To the extent that there was a malfunction after Dr. Mastropietro treated the plaintiff in 2011 she said there was nothing wrong with the TVP. Is that correct? Dr. Mastropietro said that. That's exactly right, Your Honor. And that was as late as 2011, which is after the accrual cutoff date. That should be the end of the analysis. And what do you mark the accrual cutoff date? April 15, 2010. What event are you referring to? Three years prior to the filing of the action. Oh, so you're just saying that you're within that period. That's correct, Your Honor. And Dr. Mastropietro takes us there unequivocally, and she's the treating physician who implanted the second sling and used a cystoscope to actually view it. So let me ask a different question. Unlike a pacemaker, it seemed to me from the results that Dr. Raz reported and what subsequently developed that it's not as though the TVT necessarily malfunctioned. I mean, it's just a piece of cloth that is kind of inserted and meant to hold organs up. So the malfunction is kind of organic, the scarification, the tissue growth over it, and so on. So it's the body's response to the implantation of this device. Yes, but because of the design defect, and that's where the expert comes in. It's the weave. Correct. It's the weave. Because it's so fine, it doesn't allow the tissue to grow through it. Okay. And so when that happens, when that happens, there is, and we see that the testimony is clear in this regard, throbbing, pulling, burning, vaginal pain in particular, not diffuse pelvic pain or abdominal pain, vaginal pain. And in 2013, when this coalesces, right, after Dr. Mastropietro said there's no problem in 2011, she has to receive trigger point injections directly into the site of the sling. And we respectfully submit that that is the time. When Ethicon takes the podium, they're going to tell us that under New York law, the clock begins to run when she says she has pain. Tell me why that's wrong. I'm sorry. The position will be that the clock begins to run when she feels pain. Yes. So, and that gets back to- Well, it has to be pain. They have to show that the pain's etiology is failure of the device. That's exactly right. And that's not at all what Dr. Grimes says. Dr. Grimes says, I can't tell you what caused it. That's exactly right. And that conflation of symptoms overall and symptoms related to the malfunction- And that, Dr. Grimes confirms, what some of the other doctors said, that it's not clear what was causing her pain, which preceded the original operation in 2002 and the subsequent operation in 2006. And that's why they didn't submit Dr. Grimes' report in moving for summary judgment. An extra record question, which you're free to answer or not answer. Have any of the doctors been sued? I don't know the answer to that question. I know they're not in the caption. No doctors have been sued in this context, Your Honor. Thanks. And we've talked about the statute being triggered by the malfunction of the device, but there's also a lot of language in New York law that says it's triggered by the injury, even if you don't know the exact cause of the injury. You don't need a diagnosis to get there, right? Well, I think Martin, which is really the landmark case here, says something that's a little bit different. Martin has a device that's actually malfunctioning, right? That's the aortic heart valve transplant. Yes, Your Honor. It's a question about whether it is one aspect of the valve of the pacemaker, if you will, that's not working or a different aspect of it that led to the stroke, I guess, that Martin had. Again, here, I'm concerned that this is a different kind of, it's a design defect that is different in manifestation. And the fact that in this fact sheet, is it Percivali? Percivali, yes. Percivali says that, and seems to be reporting that after the initial implantation, she experienced, I read this to suggest changes from what she had before. Even though she had a long history of pelvic pain and kind of discomfort and irritation and so on, that now there were infections. I guess infections and other kinds of discomfort and I guess primarily pain that seemed different. And I'm having difficulty just overlooking that in light of all of the other medical debate that's going on among the experts. And I think that that difficulty is what ultimately leads to a determination that there's a tribal issue of fact. That's why this is a motion for summary judgment on time limitation, not with regard to causality. That's correct, Your Honor. Yeah. This is solely on time. That's correct. So the fact that she has pain is not enough. Someone has to tie the pain to causation. And that's exactly what Martin says. And Martin is actually more analogous here than it originally led on. Because yes, it was the heart valve. The heart valve was working fine, but it was releasing a particle into the bloodstream. So it was actually functioning engineering-wise fine, but releasing a particle. Somewhat similar here in that the TV sling was fine until it wasn't. And so in Martin, what the Court of Appeals instructs is specifically on the issue of causation and linking that, is that there are going to be complicated medical questions involved and that professional diagnostic judgment will be implicated. That's precisely the situation here. And to elevate a layperson's recount of what their symptoms were over the course of 10, 15 years is what I believe to be a conflation of what the analysis should be. And is that going to be different, excuse me for interrupting, but is that going to be different from the merits analysis about whether a design defect caused her injury? I'm sorry, say that again? We have a statute of limitations defense that involves causation between symptoms and the device. And then you have, if the plaintiff gets past the statute of limitations, then you kind of have a replay of the same issues. The issue is brought anew essentially before a jury. That is correct, Your Honor. But as far as the discrete analysis here, it's clear that the guidance that's been provided indicates, and again, all the other cases applying this always make reference to what's the medical evidence? What's the medical evidence? Here the medical evidence was kind of looked, was kind of cast aside in favor of a fact sheet that was prepared by Ms. Percivali. And we submit that under the circumstances that was improper. You've reserved three minutes of rebuttal. I have. Thank you, Your Honor. Okay, thank you. Thank you. Counsel? May it please the court. Susanna Moldavenu for Appelese, Johnson & Johnson and Ethicon. Appellants have vastly overcomplicated what is a very simple legal standard in a very simple case. This court stated the legal standard correctly in Baker v. Stryker when it said, quoting the Galletta decision, that the three-year limitations period runs from the date when plaintiff first noticed symptoms, rather than when a physician first diagnosed those symptoms. But the symptoms have to be related to the injury alleged. Yes, Your Honor. So the fact that I have a headache for two years, and I don't know why, doesn't give me a cause of action for its etiology that I learn about four years later. But if I have a headache and it's caused only by something and then I sue for that, then I can recover for that if it's within the statute of limitations period. Correct, Your Honor. So there is a connection between the symptom and causation. Yes. And so for you to persevere on your motion for an untimely claim, you have to show that the symptoms that she was experiencing were clearly and identifiably related to the alleged failure of the device. And that burden is carried by the admissions of the plaintiff. The plaintiff's admissions? In her interrogatory response. A layperson's admissions as to when she first felt the difficulties? In part, Your Honor. Is there a doctor's interpretation of her symptoms saying this clearly reflects that there was a problem with the device?  He was plaintiff's treating physician in 2018. And his medical records state that plaintiff had, quote, mesh complications, mixed incontinence, pelvic pain, dyspnea, incomplete emptying, systemic symptoms. 2018. 2018. I've read his record. Let me ask you this. But in 2006, excuse me. In 2006, when Dr. Mastropietro examined her, she said her notes reflected there was nothing wrong with the mesh that was inserted in 2000. And again in 2011, she says that. That's what counsel told us. And that's an important point. Dr. Mastropietro never believed there was anything wrong with the device. Not in 2006. That might go to credibility, but that certainly does create an issue of material fact, does it not? As to the connection between when the device failed and her symptoms? She doesn't believe the device ever failed. It doesn't create an issue of fact as to the timing of the alleged injuries. Well, she treated her. In fact, in 2006, she inserted a second device. Her notes reflect that. She made a medical decision. That's relevant for someone to consider, isn't it? That doesn't in any way create an issue of fact? Plaintiff seeks to turn this into an expert inquiry on. It sounds to me like you're asking us to decide which doctor to believe. And if it's a question of which doctor to believe, then this was inappropriate with regard to summary judgment. It sounds like a jury question if you're asking which doctor to believe. The question is not which doctor to believe. Dr. Grimes and Dr. Mastropietro just simply don't think there was ever any injury caused by the device ever. So why isn't your opinion as good as anyone else's? Well, if that were sufficient to create an issue of fact, then there could never be a case where summary judgment is granted. You didn't move on causation. You didn't say there's no material issue of fact with regard to causation, which is what Dr. Grimes is talking about. What you moved on is untimeliness. Based upon her statement, a layperson's statement that she was experiencing these difficulties, you have to tie that statement, that these are inextricably identifiably identified, with a failure of the device because of X, Y, and Z. You didn't do that. Your Honor, you cut me off before I got to the critical portion of Dr. Ross's record. I'm sorry. I'll give you the critical portion. He said, appeared after first sling surgery. That was the final portion of that record that I was attempting to read. So Dr. Ross connects it. I know, but Dr. Mastropietro contradicts it. Why isn't that a material issue of fact? She doesn't contradict the plaintiff's testimony about when her pain and incontinence returned. She doesn't think there was ever any injury. So if an expert denying causation creates an issue of fact, then summary judgment could never be granted. Because I would hazard to say the vast majority of cases, the defendant's expert denies causation. And in every single one of those cases, you couldn't have summary judgment granted. If it were required under New York law that a defendant must admit causation in order to establish a statute of limitations defense, then a defendant could never simultaneously deny causation and assert statute of limitations. I'm fairly familiar with New York law. But the problem here is that you're relying upon her assertion of a symptom. And I get that. That's fair enough in some ways. But you then have to tie the symptom that that was why she was experiencing those symptoms for a reason. Now you don't have to – the problem is that you've got a doctor that was operated on her in 2006 and said this was fine. If it wasn't fine, I would have taken it out. Then you have another doctor who operates on her when Roz operates on her. Was that 2012 when they take it out? He ultimately take out both. And there he identifies the fact that there's fibers that are grown around the mesh and that's identifiable with the pain that she's having. And he takes it out. Well, then she's clearly within the statute of limitations period in that regard, right? Because she starts her action, what, April 15th, 2013? But she doesn't claim that those injuries began then. In her plaintiff fact, she was asked, when is the first time you experienced symptoms of any of the bodily injuries you claim in your lawsuit to have resulted from the pelvic mesh product? So your view is that a lay person says I had this pain, the simple fact that they say I have this pain, if that pain is in any way attributable to a failure of the device, notwithstanding a doctor that looked at it, that operated it was inside her body and said she saw nothing wrong with it, is that her opinion starts the clock? She didn't, Dr. Mastropietro never believed anything was wrong with the device. That's not what I asked you. Stick with my question. I won't cut you off when you answer. How's that? Okay. I asked you a question. Is her, does her evaluation, her statement that she experienced symptoms trump what the doctor, her own treating physician said with regard to her examination of her and her treatment of her in 2006? Well, asking whether they trump is assuming that they compete. I don't think that Dr. Mastropietro's testimony necessarily conflicts. It's just neutral as to the start date of the injuries. In case after case, courts applying New York statute of limitations law have given credit to the plaintiff's allegations in their complaint and their deposition testimony. Sure, when a doctor later says the reason why you were feeling that is because of this. But that's not the case here. She had symptoms that were unidentifiable in terms of their ideology. Am I right in understanding, I mean, you were pointing to Dr. Ra's analysis in 2018 when he began treating her and his account of when her injuries began or when she started feeling symptoms related to it. That couldn't be firsthand knowledge, right? That has to be derivative of her account. It was her account and his review of the medical records as her treating physician. Yes, but he didn't have any firsthand physical examination. It seems to me that he doesn't have firsthand knowledge in a way that an operating physician who observed the physical site would. Isn't that correct? I don't know precisely what evidence Dr. Ra's was reviewing. Did you review Dr. Mastropietro's report? I can't hazard to guess what exactly he had before him, but it was a very detailed description of her medical records. Counsel, what is your view that the device failed? Can you tell me when you think the device failed? We accept the plaintiff's allegations when she says that the product, when she was experiencing injuries from the product by 2003, 2005 to 2006. So you believe the device failed when? Well, according to plaintiff's own expert, Dr. Elliott, he agrees that the device failed and that it failed to treat her incontinence. Her incontinence came back. Everyone agrees to that, and everyone agrees that that is a claimed injury in this lawsuit. All the experts agree that her incontinence came back, and that is one of the injuries that she is claiming here. So you're saying not that she suffered additional injuries and pain, but that it failed to cure the problem that was the basis for the implantation. Is that correct? That's the claim here, Your Honor. Also, in that her leakage increased over time, that she had pain that increased over time. That's the really, that's the puzzling thing, that Dr. Elliott really sounds more like a defense expert than he does a plaintiff's expert, because he says, and you're correct, you voted that it had failed because her incontinence had returned. That's 8-424, right? Yes, Your Honor. Okay. What do you make of that? Do we then, what do you make of that then with regard to the reliance on Master PHO then? The plaintiff's reliance on Master PHO. As we said, Your Honor, we believe that Dr. Mastro-Pietro's testimony is neutral as to when a claimed injury in this lawsuit began, because Dr. Mastro-Pietro doesn't believe there's ever a claimed injury. So the three doctors that plaintiff relies on so heavily, you've got Grimes and Mastro-Pietro, who don't think there was ever an injury. And then the third one is plaintiff's paid expert, Dr. Elliott, who couldn't say one way or the other whether there was an injury in 2006. Let me ask you further about that. So in their views that there was no injury, I thought that that would have been clarified by the removal of the first TBT that showed it was overtaken by tissue and I think the cuff was eroded or there were some aspects of it that suggested that it was being responded to by the body in a way that was not anticipated and that could have caused these symptoms. They don't acknowledge that? Or have I misunderstood something? They seek compensation for these injuries, but then their expert says, well, I can't say one way or the other whether it was caused by this device. So the plaintiff has filed a lawsuit alleging injuries that started by 2004, 2005, and has never recanted that, has never retracted that, has never limited the claims in any way, and has only offered this expert. But most of the symptoms that she was complaining of in 2003 and that are referred to in the fact sheet, those were problems that she had even before the implantation of the device, right? Her urinary incontinence was fixed for a time period and then came back shortly. She alleges both worsened. Yeah, both worsened. And as Your Honor has mentioned, this is not a case, this is not a product where you have some single event malfunction. It's a process that's alleged over time. As in, you know, in the Case Law and the Martin case, it was the process of the heart valve leaking the materials. It was the process of the IUD leaching materials. The New York law, which you both cite in your brief, is that the clock starts running on statute of limitations when the device fails. And you're saying we don't know when the device fails? Well, the language from the case law for Martin is it's the time of the injury, which in most instances is when the device malfunctions. That's the precise language. So we're going from the date of injury as alleged by this plaintiff in this lawsuit. Because failure here is an ambiguous term. Isn't that right? So what is that date in your estimation? Well, we accept only the plaintiff's allegations. We're defendants in this lawsuit who deny that there was ever any causation. Yeah. Well, so another question, though, if most of these symptoms predated the installation of or the implantation of the device, how was the plaintiff who's continuing to experience these multitudinous symptoms to know that that is an injury that's related to the device in any way that would cause her to, you know, have a duty to investigate and to file suit potentially? We can accept her allegations, her sworn allegations in this court, that that's when she knew that it was because of the device. And this happens over and over in each of these cases, in the Galletta case, in the Guisto case. The courts are accepting the plaintiff's allegations. And in Galletta, that was even when it was contradicted by the medical records. The medical records didn't reflect what the plaintiff had testified to, and the court said that didn't matter, you can't back off of your admissions now. And so over and over in New York case law, the courts are accepting. If you could not accept the plaintiff's own allegations, then a court could never grant a motion to dismiss on statute of limitations grounds. And we know that takes place all the time. And so by espousing this higher standard, it makes it where a court cannot even accept the plaintiff's allegations, and there will be an issue of fact in every case. So it's your view, then, that it's the nature of her admission as opposed to necessarily the quality of a competing analysis, the doctor's viewpoint. You say it's in the nature of her admission on her part. And no doctor offers a later date. Dr. Ross agrees- No, no, no, that's not what I'm asking. Your view is that because she answered that and put a point in the ground of the date of the onset of injury, that she's stuck with that. Absolutely. There was a very fine point on the question she was asked. It was tied to her injuries in this lawsuit. It wasn't just some generalized state, oh, I had a headache, as Your Honor said. It was her saying, I had a headache that was caused by this injury. It's a very precise question that precisely nails down her allegations in this lawsuit. Thank you, Your Honor. Thank you. Mr. Horne. Thank you, Your Honor. Just a few quick points. The elevation of Dr. Ross's opinions in 2018 over Dr. Mastropietro's at the time in question is unwarranted. As indicated- Opposing counsel tells us that Dr. Mastropietro found no cause, that she would have found nothing ever wrong about the TVP. That's correct, Your Honor. So Dr. Mastropietro not only implanted the second sling and visualized the first sling, but she also continued to treat her until 2011, a period of five years. And at the end of that period of five years, she conducted more observations and examinations of the plaintiff and specifically concluded and testified that as of that date in June 2011, there was no TVT malfunction. When was the TVP removed? I'm sorry, Your Honor? When was the TVP removed? There was an attempt to remove it by Dr. Hardart in 2013, I believe it was, and then it was ultimately the whole thing was taken out in 2018. And that brings me to my next point with regard to Dr. Elliott. So Dr. Elliott, when he says it failed, he just meant that it didn't cure the incontinence. And that's at page A424 in the record. I think Your Honor may have cited this point before, this page before. It says, and I'm going to quote here line 15, is the failure of the first TVT to definitively treat her stress incontinence a defect in the device? The answer is no. And what we know happened after that in 2018 when it came time to try and pull all this stuff out of her, is she was rendered completely incontinent as a consequence of the damage that was done by these mesh devices by then. But she was incontinent to start this whole process. That's why she had the TVP inserted in 2002. That's correct, Your Honor. And after all this insertions, removals, she is still incontinent all those years later. Far worse, Your Honor, is what my point is. Far worse. So now she is completely, not only totally incontinent, but incompetent in that regard. Has to wear diapers 24-7. So even that condition, moving beyond just the focal point vaginal pain that she experienced beginning in 2013, shows the degree of the damage that was done by the mesh. And the last point I'd like to make, Your Honor, on the Galletta case, which was referred to by the appellee. So the fact dispute in the Galletta case was whether or not a certain statement had been made by the plaintiff to his doctor on a certain date. The plaintiff said, I made that statement in 2008, and the doctor says he made that statement in 2009 or vice versa. I'm not sure which it was. But the point is it was a fact determination, whereas here they're using the lay witness as a causation expert. And I was careful to listen to the appellee's presentation. Every time she made reference to the fact sheet, it was these injuries caused by the TVT mesh. Could you address? I'm sorry, go ahead. I was about to say that in the face of the contrary medical evidence, clear, unequivocal contrary medical evidence, it is error to elevate that lay person's statement about medical causation over the medical experts, particularly on summary judgment. Could you address your friend on the other side's argument that if we were to accept your view and disregard the plaintiff's sworn allegations, statements of injury and the first time she experienced injury related to the device, that we would be turning every statute of limitations defense controversy into a merits controversy. And we never have statute of limitations defense successfully asserted at summary judgment. We have trial and everything. I disagree with that for two reasons. Number one is that you're always able to argue in the alternative based upon whatever the factual presentation is at that particular time. But more importantly, what we're talking about here is a very discreet set of circumstances involving a fact sheet. That's what we're talking about. And so at the end of the day, when it's incumbent upon the defendant, in accordance with Martin, to prove, has the burden going forward to prove that the malfunction caused injury predated the accrual cutoff date, it's incumbent to prove that. But here, where the defense denies causation and denies malfunction, and the plaintiff has asserted, a counsel plaintiff has asserted under oath, that she first felt symptoms related to the device on a date that's well outside the statute of limitations here. How can we just ignore that and turn this into a dispute of fact? I think that's precisely what it is, Your Honor. I mean, that's certainly something that she can be cross-examined on. That's certainly something where the experts can weigh in on whether or not that's even possible under the circumstances. Donor representations in some way, I mean, she's measuring her claim. What does her complaint say when her cause of action occurred? I mean, it's the same concept with regard to filling out the fact sheet and ultimately having, you know, later on in the litigation, the medical evidence establishing otherwise. So I think that at the end of the day, when you juxtapose the two, and when you really weigh the fact that this is a questionnaire that's prepared by a layperson, counseled as it may be, when it's contrary to the medical evidence, it seems to me that that's a classic tribal issue of fact that should be weighed by the court. I'm going to display rank ignorance of multi-district litigation. How are these questionnaires treated? Are they treated as pleadings? They are sworn. They're not treated as pleadings. She swears to it. I'm sorry, Your Honor? So she swears to something about which she doesn't really know? They're treated as, I understand that they're treated as interrogatories, Your Honor. Right. And they're verified? Yeah, they're sworn. Yeah, I believe that they're sworn, Your Honor. And what has there been prior to the submission of these fact sheets by way of proceedings to date? My understanding is that it's actually, although a lot of time has elapsed, there hasn't been much litigation, and it was only when it was transferred up here for determination that the summary judgment was brought up here. I'm just wondering whether in the prior, you know, in the early stages of the MDL, there had been sufficient kind of development of the kind of issues that people are seeing, because we see also, you know, a recent decision in Paisano by Judge Seibel, who also affirms a dismissal or dismisses a case on summary judgment grounds in quite similar circumstances, although there are some differences as to whether the injuries or the pain, you know, was different in kind or was similar or what have you to what was experienced prior to the implantation of the device. And I think that Your Honor just hit the nail on the head with regard to the distinction between the recent decision in Paisano and the situation that we have Paisano, excuse me, and what we have here is that in Paisano, again, the vaginal pain, the bleeding, the burning sensation, this is what were the hallmarks of the device's failure. And in Paisano, that was apparent almost immediately. Whereas here, we see there's an arc that encompasses Dr. Mastropietro's treatment, where none of that exists until 2013, 2011, 2012, 2013. Does the record reflect that none of that existed? I thought she had continuing pain. This person's been in pain and difficulty for a very long time. And that's absolutely correct, Your Honor. But I go back to the point that I tried to make earlier, which is there's a distinct difference, given the nature of the malfunction as established by plaintiff's expert, between diffuse pelvic pain or abdominal pain and focal site pain, burning, bleeding, requiring trigger point injections. That's the distinct difference. And that's the distinction that wasn't applied or considered or weighed by the lower court in this context. When did she get the injections and who administered them? I'm sorry, Your Honor? When did she get the injections? She got the injections from Dr. Hardart in 2013. And this was when Ms. Percivality testified. The question was asked to her at page 55 of the record, what changed? And she said it was the pulling. It was the burning. And this is what changed for her. And that was borne out. You said in Paisano, though, that the fact that you have new symptoms that are worse later on doesn't reset the statute of limitations. Except that here, those very symptoms are caused by the malfunction. Just like in Paisano, those very same symptoms were caused by the malfunction. The difference between the two is that in Paisano, those symptoms were apparent very, very quickly. Whereas in this case, they weren't apparent for years. All right. Thank you very much. The New York courts haven't had a MeSH case, right? I'm sorry, Your Honor? The New York Court of Appeals has not had a MeSH case, has it? Not that I'm aware of, Your Honor, no. All right. All right. Thank you very much. Thank you, Your Honor. Well argued. Thank you both for a reserved decision. Thank you very much. Thank you. You've come a long ways. You gave me a hard time. Thank you. Thank you.